## Case No. 1,150.

### The BAY STATE.

[11 N. Y. Leg. Ob. 297.]

Circuit Court, S. D. New York.[1]

COLLISION—SPEED IN A FOG—SIGNALS BY SAILING VESSEL — MUTUAL FAULT — APPORTIONMENT OF DAMAGES.

1. *Held*—That whether the speed of a steamer be excessive and culpable, depends upon the circumstances of the case. That the speed of sixteen or seventeen knots during a dense fog, and upon a frequented track, was grossly improper.

[See note at end of case.]

2. *Held*—That a vessel becalmed under canvass, in the track of a steamer, under such circumstances, was not culpable for omitting to use fog horns, or other measures, which the evidence showed would have been of no avail.

[See note at end of case.]

3. The rule of apportionment, where fault exists on both sides, is considered by the supreme court to be the admiralty rule to be adopted by the courts of the United States.

[Appeal from the district court of the United States for the southern district of New York.]  .

[In admiralty. Libel by Goldsmith, Wells, and others, owners of the schooner Oriana, against the steamboat Bay State, to recover damages for collision. The district court rendered a decree for libellants, and apportioned the damages between the two vessels. The Bay State, Case No. 1,148. The case is now heard on appeal from that decree. Reversed. The decree of this court was afterward affirmed by the supreme court in McCready v. Goldsmith, 18 How. (59 U. S.) 89.]

F. B. Cutting, for the Oriana.

D. Lord, Jr., for the Bay State.

NELSON, Circuit Justice. This case should have been decided at a much earlier day, but, after hearing the very able arguments of the counsel for the respective parties, I felt that it involved some principles of considerable practical importance, and deserved, therefore, the most careful and deliberate consideration. I admit, also, that I felt more doubt and embarrassment on the argument as to the side upon which the merits of the case lay, and hence desired to look more critically into the facts, than I now do after a more thorough examination. The difficulty my mind labored under, during the argument, was not so much in reconciling and settling the facts of the case, as in determining the force and effect to be given to them; for I have rarely met with a case of this class, where the material facts upon which it must ultimately turn, were less contradictory.

It is agreed, as respects the weather, that the fog was so dense that a vessel could not have been seen further than from one to two hundred feet; that the schooner lay helpless

[1] [Reversing Case No. 1,148. Affirmed in 18 How. (59 U. S.) 89.]

in the waters of the Sound, some four or five miles from Connecticut shore, off Watch Hill light; that the Bay State was coming down the Sound at the rate of sixteen or seventeen miles an hour when the collision occurred; and that the place where it happened, or rather the waters in which it happened, are frequented by vessels engaged in the coasting trade of the eastern states, to and with the city of New York and other ports upon the North river, embracing, also, as we see from this case, the coal trade with the state of Pennsylvania, the whole a trade through the Sound of no inconsiderable magnitude and importance. These are facts indisputable. Now I agree that it is not for the court to lay down any fixed and inflexible rule in respect to the rate of speed of steam vessels navigating these waters. That must depend upon circumstances as they appear, and are presented for its consideration in each particular case. These may warrant a rate deemed prudent navigation at one time, that might be wholly injustifiable at another. But I think I may say that, in a case circumstanced as the present is, a fog so dense that the most vigilant and experienced look-out would be unable to discover a vessel at a distance of more than 30 or 60 yards, navigating at the time in waters frequented with sailing vessels, engaged in the commerce of the country, as in the present instance, a rate of sixteen or seventeen miles an hour is altogether inadmissible as prudent or reasonably safe navigation. The pilot says it would take from four to five minutes to stop the Bay State at this rate of speed. At a reduced rate, of course, it would require a proportionally less period of time. This, in addition to the better opportunity for each vessel to make the proper manoeuvres to avoid the collision, affords strong ground for impressing upon those navigating these vessels the necessity of slackening their speed in thick weather, and in a track where other water craft are usually to be found. A passenger on board the Bay State, who witnessed the collision, seems to have been struck with the impropriety of her rate of speed at the time, and asked why they ran so fast in a fog, and was answered that they had to do so in order to keep their reckoning in going from place to place; and we learn from the pilot, and some others of the officers, that they never make any difference in the rate of speed in consequence of a fog—that they go slow when making land or light, or in narrow passages, or to heave the lead—as if the only precautions they were bound to serve in the navigation were in regard to the safety of their own vessel. I will only repeat the remark made in the case of The New Jersey and which was taken from the case of The Rose, 2 W. Rob. Adm. 1, in the English admiralty: "That it may be a matter of convenience that steam vessels should proceed with great rapidity; but the law will not

justify them in proceeding with such rapidity, if the property and lives of other parties are thereby endangered." Newton v. Stebbins, 10 How. [51 U. S.] 606. I am satisfied, therefore, that this vessel was grossly in fault from the rate of speed upon her, under the circumstances, at the time the collision occurred.

The next question is, whether or not the schooner was in fault. This depends upon another—namely, whether she omitted any precautionary measures which she was bound to observe under the circumstances—such as blowing a horn or beating empty casks; by which means notice might be given to vessels approaching her position. The proofs show that an outcry was made by the master and hands, immediately on hearing the paddling of the wheels of the steamboat and before she was seen through the fog.

The usage proved as to blowing horns on vessels in a fog is limited to occasions when there is sufficient wind for them to make head; as, in the case of a dead calm, the precaution would be unnecessary, as no danger of a collision could occur. This is doubtless true in respect to sailing vessels, but the reason for the omission would not apply upon waters navigated by steam vessels; but, in respect to these—especially in the instance of vessels of the size of the Bay State—I am not satisfied that this precautionary step could be of any avail, as the noise of the machinery and motion of the boat in the water would prevent the sound reaching them. I think this is the fair inference from proofs in the case, and accords with experience and observation. The witnesses on the part of the Bay State agree that the noise of the motion of the boat in the water could be heard at a much greater distance than their own fog bell, and some of them consider the bell on these occasions useless, for this reason; and one of them states expressly that he did not recollect ever hearing a horn on a steamboat while she was under way, but had after she stopped. A horn, it is said by some of the witnesses, cannot be heard over a mile and a half, at farthest; and if so, it certainly could not be heard anything like that distance, if at all, on board a steamboat in motion. The Bay State was moving at a rate, as we have said, of more than a mile in four minutes; and we are quite well satisfied that under these circumstances, if a horn could have been heard at all, it could not, in time, upon any reasonable calculation, to have materially influenced the result. The point was pressed in the case of The Europa, that the Charles Bartlett should have blown a fog horn or rung her bell at short intervals, and that she was therefore at fault for this neglect. But the omission was disregarded by Dr. Lushington and the trinity masters, and apparently, so far as we can learn from the report of the case, on the ground that these precautions would have been useless, from the noise of the Europa while under way. 2 Eng. Law & Eq. (Boston Ed.) 557. I must therefore reverse the decree of the court below, and direct a decree in favor of the libellants, and that the case be referred to the clerk to take proof of their damages and loss by reason of the collision.

NOTE, [from original report.] After delivering the above opinion, counsel suggested whether the rule of apportionment adopted by the court below was coincided with, and to be enforced in cases of fault on both sides. Judge Nelson observed that it had been before the supreme court, and by them the English rule was regarded as the one to be recognized by the admiralty courts of the United States. The rule of apportionment would seem to have been recognized as early as 1843,—Strout v. Foster, 1 How. [42 U. S.] 92,—and to be applied whenever the proper case was presented,—Stainback v. Rae, 14 How. [55 U. S.] 538; The Bay State, [Case No. 1,148;] The Jamaica, [Id. 7,173.]

[NOTE. This decree was affirmed by the supreme court in McCready v. Goldsmith, 18 How. (59 U. S.) 89. Mr. Justice Nelson, in delivering the opinion, adopted the language of the circuit court in the principal case, as to the negligence of the steamer in running at so high a rate of speed. In respect to the failure of the schooner to make her position known by signals, the learned justice said: "A good many witnesses have been examined as to the usage of vessels navigating the Sound, in respect to the blowing of horns, beating of empty barrels, and the like, in thick and foggy weather; but, on looking carefully into the testimony, it will be found that no such general or established usage has been proved. * * * Without much more evidence of the usage, and of its utility in preventing collisions, than is shown in this case, we cannot say that the omission to comply with it is of itself chargeable as a fault against the schooner. * * * Besides, we are not satisfied, upon the evidence, that the precautionary measure of blowing horns, or ringing a fog bell, would have been of any avail under the circumstances of this case. * * * The steamer, as we have seen, was moving at a rate of more than a mile in four minutes; and taking into view the size of the Bay State, with her powerful engines, together with this rate of speed, it is quite apparent, that, if a horn could have been heard at all, it could not, upon any reasonable conclusion, in time to have materially influenced the result."]